BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

KRISTOPHER KLECZ, derivatively on behalf of TATTOOED CHEF, INC.,

Plaintiff,

v.

SALVATORE GALLETTI, STEPHANIE DIECKMANN, DAVID BORIS, PAULA CIARAMITARO, JENNIFER FELLNER, EDWARD GELFAND, RYAN OLOHAN, MARIE QUINTERO-JOHNSON, BRYAN ROSENBERG, AND DANIEL WILLIAMSON,

Defendants,

and

TATTOOED CHEF, INC.,

Nominal Defendant.

Case No. _____

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Kristopher Klecz ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning himself, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes a review and analysis of: (a) filings in various proceedings, including a class action lawsuit alleging nominal defendant Tattooed Chef, Inc. ("Tattooed Chef" or the "Company") and its executives violated federal securities laws; (b) the Company's filings with the U.S. Securities and Exchange Commission ("SEC"); (c) Tattooed Chef's press releases, website, corporate governance documents, presentations, and conference calls; and (d) analyst reports and other publicly available information concerning the Company and its Board of Directors (the "Board").

## NATURE OF THE ACTION

1. This stockholder derivative action is brought on behalf of Tattooed Chef against certain current and former Tattooed Chef executives and members of the Board (the "Individual Defendants")[1] for, among other things, breaching their fiduciary duties to Company stockholders and violating the federal securities laws by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements from March 20, 2021 through October 12, 2022 (the "Relevant Period") regarding the Company's business and finances, and the adequacy and maintenance of its internal controls.

2. Founded in 2009, Tattooed Chef is a frozen food company that sells grain free, gluten free, vegan, vegetarian, and/or organic foods to consumers.

3. During the Relevant Period, the Individual Defendants stated the Company was "committed to the continuous improvement of [its] internal control over financial reporting," would "continue to diligently review [its] internal control over

---

[1] The Individual Defendants are: Salvatore Galletti, Stephanie Dieckmann, David Boris, Paula Ciaramitaro, Jennifer Fellner, Edward Gelfand, Ryan Olohan, Marie Quintero-Johnson, Bryan Rosenberg, and Daniel Williamson.

financial reporting," and that its "consolidated financial statements present[ed] fairly, in all material respects, [the Company's] financial position" and were drafted in conformity with U.S. Generally Accepted Accounting Principles ("GAAP").

4.      In reality, and as detailed herein, the Company's publicly reported financials throughout the Relevant Period violated GAAP, could not be relied upon, and caused Defendants to restate over a year's worth of the Company's financial statements, resulting in significant losses. In addition, throughout the Relevant Period, Defendants failed to adequately oversee the Company's internal control over its financial reporting.

5.      As detailed further herein, throughout the Relevant Period, the Individual Defendants intentionally or recklessly made or permitted others to make false and misleading statements and failed to disclose that: (a) the Company's financial statements from March 31, 2021 to the present could not be relied upon, including because they overstated revenue and understated losses; (b) the Company would need to restate its previously filed financial statements for certain periods; and (c) the Company's internal controls – far from being continuously improved as touted by Defendants – suffered serious deficiencies and were not adequately maintained.

6.      The truth began to emerge on March 11, 2022, when the Company issued a press release revealing the Board's March 7, 2022 conclusion that the Company's consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021, and September 30, 2021 should no longer be relied upon. Despite these revelations, the Individual Defendants continued to make false and misleading statements and omissions about the Company's internal control over financial reporting.

7.      The truth did not fully emerge until October 12, 2022 when the Company filed a Form 8-K with the SEC which revealed that a multitude of the Company's financial statements issued throughout the Relevant Period were "materially misstated and should no longer be relied upon and should be restated." Specifically, the

Company revealed that it had overstated revenue and understated losses for its "unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021, and September 30, 2021, and its audited annual consolidated financial statements for the year ended December 31, 2021." On this news, Tattooed Chef's share price fell $0.44 per share, or 9.8%, from closing at $4.49 per share on October 12, 2022 to opening at $4.05 per share on October 13, 2022.

8.  As a result of the foregoing, Tattooed Chef, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") have been named as defendants in a securities class action lawsuit (the "Securities Class Action")[2] which alleges investors were damaged when they purchased Tattooed Chef shares during the Relevant Period.

9.  To make matters worse, during the Relevant Period, while the Company's stock price was artificially inflated, and while in possession of material non-public Company information, Defendant Galletti sold 800,000 shares of Company stock.

10.  As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial harm, including the costs of defending against and potential class-wide liability in the related Securities Class Action, as well as additional damages, including reputational harm and loss of goodwill.

11.  Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act. Demand is excused because each

---

[2]  The Securities Class Action, captioned *Mihaylov v. Tattooed Chef, Inc.*, No. 22-cv-09311 (C.D. Cal.), also includes claims and potential claims by the following plaintiffs that have joined the action or moved to intervene therein: Dinko Mihaylov, John Hancock, Shashank Bagul, John Spadaro, Mustapha Hotait, Marco Starace, Viktor Grigorescu, Gyrosol V. Johnston, Dan Kogan, Kogan Holdings Limited, Saphira TrangDai Tran, Abdiselam Abdulahi, Ben Ganje, Mohamed Saad, Nassib Awad, Dolev Cohen, Eric Staley, Daryl Wood, and Minderpal Gulati.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

member of the Board faces a substantial likelihood of liability for the misconduct alleged herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act ("Exchange Act"), 15 U.S.C. § 78n(a)(1); Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9; and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## THE PARTIES

*Plaintiff*

17.     Plaintiff currently holds shares of Tattooed Chef common stock and has been a continuous holder at all relevant times.

*Nominal Defendant*

18.     Tattooed Chef is a Delaware Corporation with its principal executive offices at 6305 Alondra Boulevard, Paramount, California 90723.

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*The Individual Defendants*

19.    Defendant Salvatore Galletti ("Galletti") has served as a Company's President and CEO since 2009, and has served as a Company director since 2020. In 2020 and 2021, Defendant Galletti received $387,067 and $375,000 in total compensation from the Company, respectively. During the Relevant Period, while the Company's stock price was artificially inflated, before the scheme was exposed, and while in possession of material non-public Company information, Defendant Galletti sold Company stock, including on April 15, 2021, when he sold 800,000 shares.

20.    Defendant Stephanie Dieckmann ("Dieckmann") has served as the Company's Chief Financial Officer since April 2021. In 2020 and 2021, Defendant Dieckmann received $13,203,846 and $380,423 in total compensation from the Company, respectively.

21.    Defendant David Boris ("Boris") has served as a Company director since 2018. In 2020, Defendant Boris received $100,000 in total compensation from the Company.

22.    Defendant Paula Ciaramitaro ("Ciaramitaro") has served as a Company director since 2020. Defendant Ciaramitaro received $100,000 in total compensation from the Company in both 2020 and 2021.

23.    Defendant Jennifer Fellner ("Fellner") has served as a Company director since 2020. Defendant Fellner received $100,000 in total compensation from the Company in both 2020 and 2021.

24.    Defendant Edward Gelfand ("Gelfand") has served as a Company director since 2020. In 2020 and 2021, Defendant Gelfand received $100,000 and $125,000 in total compensation from the Company, respectively.

25.    Defendant Ryan Olohan ("Olohan") has served as a Company director since 2020. Defendant Olohan received $100,000 in total compensation from the Company in both 2020 and 2021.

26.    Defendant Marie Quintero-Johnson ("Quintero-Johnson") has served as

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a Company director since 2020. Defendant Quintero-Johnson received $100,000 in total compensation from the Company in both 2020 and 2021.

27.     Defendant Bryan Rosenberg ("Rosenberg") has served as a Company director since 2020. In 2020 and 2021, Defendant Rosenberg received $100,000 and $125,000 in total compensation from the Company, respectively.

28.     Defendant Daniel Williamson ("Williamson") has served as a Company director since 2020. Defendant Williamson received $100,000 in total compensation from the Company in both 2020 and 2021.

## DEFENDANTS' FIDUCIARY DUTIES

29.     By reason of their positions as officers, directors and/or fiduciaries of Tattooed Chef and because of their ability to control the business and corporate affairs of Tattooed Chef, the Individual Defendants owed Tattooed Chef and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

30.     The Individual Defendants were and are required to act in furtherance of the best interests of Tattooed Chef and its shareholders to benefit all shareholders equally and not in furtherance of their own person interest or benefit.

31.     Each director and officer of the Company owes to Tattooed Chef and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

32.     The officers and directors of Tattooed Chef were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

33.     Each Individual Defendant, under his/her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. To discharge their duties, officers and directors of Tattooed

Chef were required to, among other things:

      a.  Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with all applicable district, state, and federal laws rules, regulations, and requirements, and pursuant to Tattooed Chef's Code of Conduct and internal guidelines;

      b.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to provide the highest quality performance of its business;

      c.  Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

      d.  Maintain and implement an adequate system of internal legal, financial, and management controls to ensure that Tattooed Chef's operations would comply with all laws and that Tattooed Chef's regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      e.  Refrain from unduly benefitting themselves and other Company insiders at the expense of the Company; and

      f.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to rectify the misconduct and prevent its recurrence.

34.    The Individual Defendants had a duty to prevent the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings and business prospect. As fiduciaries, the Individual Defendants had a duty to disclose in regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

35. The Individual Defendants, because of their position of authority as directors and/or officers of Tattooed Chef, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

38. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

39. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Tattooed Chef, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary

wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

41.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of Tattooed Chef and at all times acted within the course and scope of such agency.

## TATTOOED CHEF'S CODE OF ETHICS

42.    Tattooed Chef's Code of Ethics is "applicable to all of the Company's directors, officers, and employees."

43.    In a section titled, "Honest, Ethical and Fair Conduct," the Code of Ethics states the following, in relevant part:

> Each person must: . . . Avoid conflicts of interest, wherever possible, except as may be allowed under guidelines or resolutions approved by the Board (or the appropriate committee of the Board) or as disclosed in the Company's public filings with the SEC. Anything that would be a conflict for a person subject to this Code also will be a conflict for a member of his or her immediate family or any other close relative.

44.    In a section titled, "Financial Statements and Other Records," the Code of Ethics states:

> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Board or the Company's internal or external legal counsel.

45.     In a section titled, "Disclosure," the Code of Ethics states the following, in relevant part:

The Company strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must:

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accountants, governmental regulators, self-regulating organizations and other governmental officials, as appropriate; and

- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness. In addition to the foregoing, the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO") of the Company and each subsidiary of the Company (or persons performing similar functions), and each other person that typically is involved in the financial reporting of the Company, must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

46.     In a section titled, "Compliance," the Code of Ethics states the following, in relevant part:

It is the Company's obligation and policy to comply with all applicable governmental laws, rules and regulations. All directors, officers and employees of the Company are expected to understand, respect and comply with all of the laws, regulations, policies and procedures that apply to them in their positions with the Company. Employees are responsible for talking to their supervisors to determine which laws, regulations and Company policies apply to their position and what training is necessary to understand and comply with them.

47.     In a section titled, "Reporting and Accountability," the Code of Ethics states the following, in relevant part:

The Board, or a committee designated by the Board for such purpose, is responsible for applying this Code to specific situations in which questions are presented to it and has the authority to interpret this Code in any particular situation. Any person who becomes aware of any existing or potential breach of this Code is required to notify the Chairperson of the Board promptly. Failure to do so is, in and of itself, a breach of this Code.

48.     In a section titled, "Insider Information and Securities Trading," the Code of Ethics states the following, in relevant part:

No person who is aware of material, non-public information about the Company may, directly or indirectly, buy or sell the Company's

securities or engage in another action to take advantage of such information. It is also against the law to trade or to "tip" others who might make an investment decision based on material, non-public information about the Company. For example, using material, non-public information to buy or sell the Company's securities, options in the Company's securities or the securities of any Company supplier, customer or competitor is prohibited. The consequences of insider trading violations can be severe. These rules also apply to the use of material, nonpublic information about other companies (including, for example, our customers, competitors and potential business partners).

49.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise their violations of law.

50.    Defendant Galletti also violated the Code of Ethics by engaging in insider trading.

51.    In further violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## TATTOOED CHEF'S AUDIT COMMITTEE CHARTER

52.    Tattooed Chef's Audit Committee maintains a charter (the "Charter") which states, with respect to the Company's annual Form 10-K, that the Audit Committee will "[r]eview and discuss the annual audited financial statements and the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations' with management and the independent registered public accounting firm."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

53.     With respect to the Company's quarterly Forms 10-Q, the Charter states that the Audit Committee will:

Review and discuss the quarterly financial statements and the Company's disclosures provided in periodic quarterly reports including 'Management's Discussion and Analysis of Financial Condition and Results of Operations' with management, the senior internal auditing executive (or outside internal auditing principal, if applicable) and the independent registered public accounting firm.

54.     With respect to the Company's earnings press releases, the Charter provides that the Audit Committee will:

[d]iscuss policies and procedures concerning earnings press releases and review the type and presentation of information to be included in earnings press releases (paying particular attention to any use of 'pro forma' or 'adjusted' non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

55.     With respect to risk assessment and management, the Charter states that the Audit Committee will:

[d]iscuss policies and guidelines to govern the process by which risk assessment and risk management is undertaken [and] [m]eet periodically (not less than annually) with management to review and assess the Company's major financial risk exposures and the manner in which such risks are being monitored and controlled.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

56.     With respect to the Company's internal control over financial reporting, the Charter states that the Audit Committee will:

Review with the chief executive officer, chief financial officer, and independent registered public accounting firm, periodically, the following:

- all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
- any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

## SUBSTANTIVE ALLEGATIONS

57.     As detailed herein, throughout the Relevant Period, the Individual Defendants intentionally or recklessly made or permitted others to make false and misleading statements and failed to disclose that: (a) the Company's financial statements from March 31, 2021 could not be relied upon, including because they overstated revenue and understated losses; (b) as a result, the Company would need to restate its previously filed financial statements for certain periods; and (c) the Company had serious issues with its internal controls, which, far from being improved, were not adequately maintained.

58.     On March 19, 2021, Defendants filed with the SEC its 2020 Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report"). The 2020 Annual Report was signed by Defendants Galletti, Rosenberg, Ciaramitaro, Gelfand, Williamson, Fellner, Olohan, Boris, and Quintero-Johnson. Attached to the 2020 Annual Report were certifications pursuant to the Sarbanes-

Oxley Act of 2002 ("SOX") signed by Defendants Galletti and Dieckmann attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

59.     The 2020 Annual Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls and its remediation efforts:

**Controls and Procedures.**

We have begun the process of, and we are focused on, designing and implementing effective internal controls measures to improve our internal control over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:

- We hired qualified staff and outside resources to segregate key functions within our financial and information technology processes supporting our internal controls over financial reporting.
- We developed internal controls documentation, including comprehensive accounting policies and procedures and designed, implemented, and tested new controls over key financial processes.

While these actions and plans are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles, we are committed to the continuous improvement of our internal control over financial reporting and will continue to diligently review our internal control over financial reporting.

60.     On April 16, 2021, the Company filed a Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Galletti, Boris, Ciaramitaro, Fellner, Gelfand,

Olohan, Quintero-Johnson, Rosenberg, and Williamson solicited the 2021 Proxy Statement which contained material misstatements and omissions.

61.     The 2021 Proxy Statement called for Company shareholders to vote to, *inter alia*, elect Defendants Boris, Olohan, and Quintero-Johnson to the Board.

62.     With respect to the Company's Code of Ethics, the 2021 Proxy Statement stated the following:

> We have adopted a code of ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. The code of ethics is available on our website at www.tattooedchef.com. To the extent required by law, we expect to disclose any amendments to the code, or any waivers of its requirements, on our website.

63.     With respect to the "Board's Role in Risk Oversight," the 2021 Proxy Statement stated the following:

> The Board has ultimate responsibility for oversight of our risk management processes. The Board discharges this oversight responsibility through regular reports received from and discussions with senior management on areas of material risk exposure to us. The Board of Directors has overall responsibility for risk oversight, including, as part of regular Board and committee meetings, general oversight of executives' management of risks relevant to the Company. While the full Board has overall responsibility for risk oversight and is currently overseeing our business continuity risks, such as risks relating to the COVID-19 pandemic, it is supported in this function by its audit committee, compensation committee, nominating and corporate

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

governance committee, and food safety committee. Each of the committees regularly reports to the Board.

64.     In addition to the other reasons described herein, the 2021 Proxy Statement was materially misleading because it failed to disclose that the Individual Defendants violated the Code of Ethics, and contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it.

65.     On May 18, 2021, the Company filed with the SEC its 2021 First Quarter report on Form 10-Q for the year ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were certifications pursuant to SOX signed by Defendants Galletti and Dieckmann attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

66.     The 1Q21 revealed the Company reported a net revenue of $52,682,000 and net loss of $8,152,000.

67.     The 1Q21 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls and remediation efforts:

**CONTROLS AND PROCEDURES**

We have begun the process of, and we are focused on, designing and implementing effective internal controls measures to improve our internal control over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:

- We hired qualified staff and outside resources to segregate key functions within our financial and information technology

processes supporting our internal controls over financial reporting.

- We developed internal controls documentation, including comprehensive accounting policies and procedures and designed, implemented, and tested new controls over key financial processes.

While these actions and planned actions are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles, we are committed to the continuous improvement of our internal control over financial reporting and will continue to diligently review our internal control over financial reporting.

* * *

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of March 31, 2021, our disclosure controls and procedures were not effective due to the material weaknesses in our internal control over financial reporting described above.

However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Quarterly Report were prepared in accordance with U.S. GAAP, our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of

operations and cash flows for the periods disclosed in conformity with U.S. GAAP.

**Changes in Internal Control Over Financial Reporting**

Other than described above in this Item 4, there has been no change in our internal control over financial reporting during the fiscal quarter ended March 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

68.     On August 16, 2021, the Company filed with the SEC its second quarter report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to SOX signed by Defendants Galletti and Dieckmann attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

69.     The 2Q21 Report revealed the Company reported a net revenue of $50,716,000 the three months ended June 30, 2021 and $103,398,000 the six months ended June 30, 2021, and a net loss of $53,196,000 the three months ended June 30, 2021 and $61,348,000 the six months ended June 30, 2021.

70.     The 2Q21 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls and remediation efforts:

Our management, with the participation of our chief executive officer and chief financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of June 30, 2021, our

disclosure controls and procedures were not effective due to the material weaknesses in our internal control over financial reporting described above.

However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Quarterly Report were prepared in accordance with U.S. GAAP, our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.

**Changes in Internal Control Over Financial Reporting**

Other than described above in this Item 4, there has been no change in our internal control over financial reporting during the fiscal quarter ended June 30, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

71.     On November 22, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Galletti and Dieckmann attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

72.     The 3Q21 Report revealed the Company reported a net revenue of $58,780,000 the three months ended September 30, 2021 and $161,972,000 the nine months ended September 30, 2021, and a net loss of $8,174,000 the three months

ended September 30, 2021, and $70,095,000 the nine months ended September 30, 2021.

73.    The 3Q21 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls and remediation efforts:

> However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Quarterly Report were prepared in accordance with U.S. GAAP, our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.
>
> **Changes in Internal Control Over Financial Reporting**
> Other than described above in this Item 4, there has been no change in our internal control over financial reporting during the fiscal quarter ended September 30, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

74.    On March 11, 2022, the Company issued a press release revealing that it would:

> restate prior period financial statements for each of the quarterly periods ended March 31, 2021, June 30, 2021 and September 30, 2021 because the Company did not properly record the tax effects associated with the Company's issuance of 825,000 shares of its common stock to Harrison Co. in June 2021 as partial consideration for services rendered in

connection with the Company's de-SPAC transaction that occurred in October 2020.

75.     On this news, the Company's share price fell $1.03 per share, or 9.07%, from closing at $11.36 per share on March 11, 2022 to close at $10.33 per share on March 14, 2022.

76.     On March 16, 2022, the Company filed with the SEC its annual report and fourth quarter and annual results on Form 10-K for the period ended December 31, 2021 (the "2021 Annual Report"). The 2021 Annual Report was signed by Defendants Galletti, Dieckmann, Rosenberg, Ciaramitaro, Gelfand, Williamson, Fellner, Boris, and Quintero-Johnson. Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Galletti and Dieckmann attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

77.     The 2021 Annual Report revealed the Company reported a net revenue of $213,430,000 and a net loss of $87,404,000.

78.     The 2021 Annual Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls and remediation efforts:

> However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Annual Report on Form 10-K were prepared in accordance with U.S. GAAP, our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.

**Remediation of Material Weaknesses**

We have begun the process of, and we are focused on, designing and implementing effective measures to improve our internal controls over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:

- Hired qualified staff and outside resources to segregate key functions within our financial and information technology processes supporting our internal controls over financial reporting;
- Hired several qualified accounting professionals with appropriate level of expense and training to design, maintain and improve our accounting policies, procedures and controls to prevent and detect material misstatements related to the presentation and disclosures of the consolidated financial statements;
- Developed internal controls documentation, including comprehensive accounting policies and procedures over certain key financial processes and related disclosures; and
- Drafted position papers for all complex, non-recurring transactions.

While these actions and planned actions are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles, we are committed to the continuous improvement of our internal control over financial reporting and will continue to diligently review our internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting**

Other than described above in this Item 9A, there has been no change in our internal control over financial reporting during the fiscal year ended

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

December 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

79.     On April 21, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Fellner, Gelfand, Williamson, Ciaramitaro, Galletti, Rosenberg, Boris, Olohan, and Quintero-Johnson solicited the 2022 Proxy Statement which contained material misstatements and omissions. The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*, elect Defendants Fellner, Gelfand, and Williamson to the Board.

80.     With respect to the Company's Code of Ethics, the 2022 Proxy Statement stated the following:

> We have adopted a code of ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. The code of ethics is available on our website at *www.tattooedchef.com*. To the extent required by law, we expect to disclose any amendments to the code, or any waivers of its requirements, on our website.

81.     With respect to the "Board's Role in Risk Oversight," the 2022 Proxy Statement stated the following:

> Our Board has ultimate responsibility for oversight of our risk management processes. Our Board discharges this oversight responsibility through regular reports received from and discussions with senior management on areas of material risk exposure to us. Our Board has overall responsibility for risk oversight, including, as part of regular Board and committee meetings, general oversight of executives'

management of risks relevant to our business. While the full Board has overall responsibility for risk oversight and is currently overseeing our business continuity risks, such as risks relating to the COVID-19 pandemic, it is supported in this function by the audit committee, compensation committee, nominating and corporate governance committee, and food safety committee. Each of the committees regularly reports to our Board.

82.     In addition to the other reasons described herein, the 2022 Proxy Statement was materially misleading because it failed to disclose that the Individual Defendants violated the Code of Ethics, and contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it.

83.     The statements contained herein were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made or permitted false and/or misleading statements and/or failed to disclose that: (a) the Company's financial statements from March 31, 2021 to the present could not be relied upon, including because they overstated revenue and understated losses; (b) the Company would need to restate its previously filed financial statements for certain periods; and (c) the Company's internal controls – far from being continuously improved as touted by Defendants – suffered serious deficiencies and were not adequately maintained.

84.     The full truth did not emerge until October 12, 2022, when the Company announced that it would restate its financial statements from March 31, 2021 to the present and revealed for the first time the revenue was overstated by $213,000 and the

net loss was understated by $90,000 on the 1Q21 Report.

85.   On the 2Q21 Report, the revenue was overstated by $446,000 the three months ended June 30, 2021, and $659,000 the six months ended June 30, 2021, and the net loss was understated by $4,276,000 the three months ended June 30, 2021, and $4,366,000 the six months ended June 30, 2021.

86.   On the 3Q21 Report, the revenue was overstated by $425,000 the three months ended September 30, 2021, and $878,000 the nine months ended September 30, 2021, and the net loss was understated by $372,000 the three months ended September 30, 2021, and $4,165,000 the nine months ended September 30, 2021.

87.   On the Annual Report, the revenue was overstated by $5,436,000 the year ended December 31, 2021.

88.   The Company also made numerous other changes in financial statements that revealed the extent of internal control weaknesses, stating the following, in pertinent part, in its current report filed with the SEC on Form 8-K:

**Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On October 6, 2022, Tattooed Chef, Inc. (the "Company") received a written notice pursuant to Item 4.02(b) from the Company's former independent registered public accounting firm, BDO USA, LLP, that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021, and its audited annual consolidated financial statements for the year ended December 31, 2021, and accompanying audit report, each as previously filed with the Securities and Exchange Commission ("SEC"), were materially misstated and should no longer be relied upon and should be restated, because the Company (a) incorrectly recorded expenses related to a multi-vendor mailer program with a large

customer as operating expenses rather than as a reduction of revenue; and (b) incorrectly recorded expenses for advertising placement by a marketing services firm on a straight-line basis over the life of the contract rather than when the services were actually rendered. For these reasons, pursuant to Item 4.02(a) the Board, after consultation with the Audit Committee, has also determined that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2022 and June 30, 2022 should no longer be relied upon.

89.     On this news, Tattooed Chefs' share price fell $0.44 per share, or 9.8%, from its close on October 12, 2022 to open on October 13, 2022 at $4.05 per share, damaging investors.

90.     As a result of the foregoing, the Securities Class Action was filed against the Company, its CEO, and CFO, which has caused and will continue to cause the Company to expend significant sums of money.

## DAMAGE TO TATTOOED CHEF

91.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred substantial financial losses, including the costs of defending and potentially incurring class wide liability in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

## DERIVATIVE ALLEGATIONS

92.     Plaintiff brings this action derivatively for the benefit of Tattooed Chef to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

93.     Plaintiff will adequately and fairly represent the interests of Tattooed Chef and its stockholders in enforcing and prosecuting its rights.

94.     Plaintiff is an owner of Tattooed Chef common stock and has been a continuous shareholder of Company stock at all relevant times.

95.     At the time this action was commenced, the Board consisted of nine directors, namely Defendants Galletti, Rosenberg, Ciaramitaro, Fellner, Gelfand, Olohan, Quintero-Johnson, Boris, and Williamson (the "Director Defendants"). Plaintiff is only required to show that five of the nine Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all nine Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

96.     A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that all nine of the Director Defendants are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

97.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

98.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties. Specifically, all nine of the Director Defendants signed: (1) the 2020 Annual Report; (2) the 2021 Proxy Statement; (3) the 2021 Annual Report; and (4) the 2022 Proxy Statement – which each contained false and misleading statements as alleged herein.

99.     Each of the Director Defendants authorized and/or permitted the false

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

100.   Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

101.   Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

102.   Defendants Gelfand, Ciaramitaro, and Quintero-Johnson serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal and regulatory compliance, and public disclosure requirements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of, the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

103.   The Director Defendants, as members of the Board, were and are subject to the Company's Codes of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The

Directors violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

104.   Further, demand is excused as to Defendant Galletti because he is the Company's President, CEO, and has been named as a defendant in the Securities Class Action. What's more, during the Relevant Period, while the Company's stock price was artificially inflated, and while in possession of material non-public Company information, Defendant Galletti sold 800,000 shares of Company stock.

105.   Furthermore, demand, in this case is excused as to all of the Company's current directors because the current directors control the Company and are indebted to each other. The current Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. Thus, any demand upon them would be futile. Moreover, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

## COUNT I
### Violations of Section 14(a) of the Exchange Act
### Against The Individual Defendants

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides:

It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the

public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section [12] of this title [15 U.S.C. § 78l].

108.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

109.   Under the direction and watch of the Director-Defendants, the 2021 Proxy Statement and 2022 Proxy Statement (the "Proxy Statements") negligently failed to disclose that contrary to the Proxy Statements' descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

110.   The Proxy Statements also failed to negligently disclose that: (a) the Company's financial statements from March 31, 2021 to the present could not be relied upon, including because they overstated revenue and understated losses; (b) the Company would need to restate its previously filed financial statements for certain periods; and (c) the Company's internal controls – far from being continuously improved– suffered serious deficiencies and were not adequately maintained.

111.   The Individual Defendants also negligently caused the 2021 Proxy Statement to be false and misleading with regard to executive compensation in that it purported to employ performance-based compensation elements while failing to disclose that the Company's revenues and losses, and therefore its financial performance, were misrepresented as a result of false and misleading statements.

112.   In the exercise of reasonable care, the Individual Defendants should have

known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval of a director incentive amendment proposal ("Incentive Amendment Proposal").

113.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the Incentive Amendment Proposal who would not have approved, among other things, Defendants Gelfand's and Rosenberg's compensation under the Incentive Amendment Proposal, had they been informed about the false and misleading statements discussed herein. As a result of shareholder approval of the Incentive Amendment Proposal, Defendants Gelfand and Rosenberg undeservedly received approximately $125,000 each in performance-based stock awards during the 2021 Fiscal Year.

114.    The false and misleading elements of the 2021 Proxy Statement led to, among other things, the approval of the Incentive Amendment Proposal and the election or re-election of Defendants Boris, Olohan, and Quintero-Johnson to the Board, which allowed them to breach or continue to breach their fiduciary duties to Tattooed Chef.

115.    The false and misleading elements of the 2022 Proxy Statement led to, among other things, the election or re-election of Defendants Fellner, Gelfand, and Williamson to the Board, which allowed them to breach or continue to breach their fiduciary duties to Tattooed Chef.

116.    The Company was damaged as a result of the Individual Defendants' negligent issuance of material misrepresentations and omissions of material facts from, the Proxy Statements.

117.    Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

## COUNT II
**Breach of Fiduciary Duty and/or Insider Selling
Against the Individual Defendants**

118.   Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

119.   The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligations of good faith, candor, loyalty, and due care.

120.   The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

121.   The Individual Defendants breached their fiduciary duties of good faith, candor, loyalty, and due care by making and/or authorizing false and misleading statements concerning the Company's business, finances, and the adequacy of its internal controls. Specifically, Defendants made or permitted false and/or misleading statements and/or failed to disclose that: (a) the Company's financial statements from March 31, 2021 to the present could not be relied upon, including because they overstated revenue and understated losses; (b) the Company would need to restate its previously filed financial statements for certain periods, including because they violated GAAP; and (c) the Company's internal controls – far from being continuously improved as touted by Defendants – suffered serious deficiencies and were not adequately maintained.

122.   The Individual Defendants further breached their fiduciary duties to Company shareholders by failing to take remedial action against the other Individual Defendants and by concealing the other Individual Defendants' fraudulent statements and material omissions.

123.   During the Relevant Period, while the Company's stock price was artificially inflated, and while in possession of material non-public Company information, Defendant Galletti sold 800,000 shares of Company stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

124.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tattooed Chef has sustained significant damages as alleged herein. As a result, the Defendants are liable to the Company.

125.   Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

## COUNT III
### Unjust Enrichment
### Against the Individual Defendants

126.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

127.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tattooed Chef.

128.   The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to Tattooed Chef.

129.   Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

130.   As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

131.   Plaintiff has no adequate remedy at law.

## COUNT IV
### Aiding and Abetting Breach of Fiduciary Duty
### Against the Individual Defendants

132.   Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

133.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have

each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

134.   Plaintiff has no adequate remedy at law.

### COUNT V
### Waste of Corporate Assets
### Against the Individual Defendants

135.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136.   The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

137.   The Individual Defendants wasted corporate assets by, among other things, incurring and paying legal costs to defend the Company and its officers against the Securities Class Action.

138.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

139.   As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

140.   Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

## COUNT VI
### Violations of Sections 10(b) and 21D of the Exchange Act
### Against Defendants Galletti and Dieckmann for Contribution

141.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.   Tattooed Chef, Defendant Galletti, and Defendant Dieckmann are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Galletti's and Dieckmann's willful and/or reckless violations of their obligations as controlling shareholder, officers and/or directors of Tattooed Chef.

143.   Defendants Galletti and Dieckmann, because of their positions of control and authority as controlling shareholders, officers and/or directors of Tattooed Chef, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Tattooed Chef, including the wrongful acts complained of herein and in the Securities Class Action.

144.   Accordingly, Defendants Galletti and Dieckmann are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

145.   As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Galletti and Dieckmann.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Tattooed Chef and that Plaintiff is a proper and adequate representative of the

Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.     Directing Tattooed Chef to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tattooed Chef and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

D.     Awarding to Tattooed Chef restitution from the Individual Defendants; Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 3, 2023

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By,   *Rachele R. Byrd*
                    RACHELE R. BYRD

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)

FERDEZA ZEKIRI (335507)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Tel: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 267-507-6085

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Kristopher Klecz, have reviewed the allegation made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true, I further declare that I am a current holder, and have been a holder, of Tattooed Chef, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of March 2023.

3/27/2023

DocuSigned by:

Kristopher Klecz

—54B2QF9AC4F5486...

_____
Kristopher Klecz